UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| THE CHOICE IS YOURS, INC.; and : | |
| JAMES SMALLWOOD, : | |
| : | |
| Plaintiffs, : | |
| v. : | No. 2:14-cv-01804 |
| : | |
| SETH WILLIAMS, *District Attorney*; : | |
| WILSON GOODE, *Mayor*; : | |
| PUBLIC/PRIVATE VENTURES; and : | |
| THE CITY OF PHILADELPHIA, : | |
| : | |
| Defendants. : | |

_____

## MEMORANDUM OPINION

**Motion for Summary Judgment of the City of Philadelphia and Seth Williams,
ECF No. 191 – Granted in part and denied in part**

**Motion for Summary Judgment of Wilson Goode, ECF No. 195 – Granted**

**Motion for Summary Judgment of Public/Private Ventures, ECF No. 196 – Granted in part
and denied in part**

**Joseph F. Leeson, Jr.**                                                                                  **September 30, 2016**
**United States District Judge**

### I. Introduction

Plaintiff James Smallwood is the founder and chief executive officer of Plaintiff The Choice is Yours, Inc., a non-profit organization located in Philadelphia, Pennsylvania, that "trains mainly minority ex-convicts and other at-risk individuals for work in the construction trades . . . while teaching reading, math, and job-hunting skills." Am. Compl. ¶¶ 24-32, ECF No. 55. According to Smallwood, since he founded the organization in 1997, over six hundred "ex-convicts, drug addicts, and homeless people" have participated in his program. *Id.* ¶ 36. In early 2012, R. Seth Williams, the District Attorney for the City of Philadelphia, announced that his office was launching a diversionary program to give "nonviolent felony drug offenders a chance to avoid prison sentences and instead receive education and workforce training, along with social services and supports" while "allow[ing] the District Attorney's Office to focus [its] limited resources on the career and truly violent criminals in Philadelphia." *See id.* Ex. 3, at 1, ECF No. 55-4. The name of the new program was "The Choice Is Yours."

1

Smallwood and his organization filed suit,[1] claiming that Williams and more than a dozen others "stole" his program through a coordinated campaign of fraud and racketeering. *See* Am. Compl. ¶ 7. Since that time, a period of targeted discovery and a number of successful motions to dismiss have whittled the group of Defendants down to four. They now move for summary judgment based on the evidence that was produced during the targeted discovery period.

## II.   Background and procedural history

The events begin on October 13, 2009, when Smallwood met with Defendant W. Wilson Goode, the former mayor of the City of Philadelphia, to talk about Smallwood's organization. *See* Smallwood Dep. 901:3-22, ECF Nos. 196-7 to -10. Smallwood believed that the two shared similar interests because Goode had founded a program dedicated to helping the children of parents who are incarcerated, and Smallwood's passion is to help people transition from incarceration to life outside of prison. *Id.* at 900:10-16, 902:4-20. Smallwood knew that Goode had many contacts who might be able to help him to secure funding for his organization, and so he saw Goode as someone who could "potentially help grow The Choice is Yours." *See id.* at 903:8-904:11. Indeed, at the time, Goode was a senior advisor to Defendant Public/Private Ventures (P/PV), a non-profit that focused on "helping young people from high poverty communities successfully transition to adulthood." *See* Pls.' Opp'n Ex. 2, at 1, 8, ECF No. 202-4. During the meeting, they "talk[ed] about funding for The Choice is Yours," the possibility of "a partnership with The Choice is Yours and one of [Goode's] organizations," and about how Smallwood's organization could "improve Philadelphia." Smallwood Dep. 902:20-7. Smallwood also gave Goode a booklet of materials about his organization—materials that Smallwood considers to be confidential.[2] *See id.* at 414:5-416:14.

The two met again two weeks later, and, according to Smallwood, they talked "[m]uch about the same thing" as the previous meeting. *Id.* at 904:14-18, 905:16-3. They had a third meeting over breakfast in December 2009, which consisted of "similar discussions [they] always have had of how to improve The Choice is Yours, how to use it to make Philadelphia a better place to live" and to improve the lives of those in the city who were homeless, and how to curtail recidivism among criminal offenders. *See id.* at 906:15-907:7, 910:19-911:9. Smallwood testified that at this third meeting, Goode "mentioned other organizations and other people who he ha[d] close ties with who he could possibility introduce [Smallwood] to that could be of help to The Choice is Yours," including P/PV, which made Smallwood "extremely excited, because [he] started to see a way that [his organization] could possibility just expand." *Id.* at 912:6-24. The two then met again in May 2010, where they talked "more about P/PV, more about funding, more about getting money," and Smallwood testified that his "enthusiasm started to grow in reference to The Choice is Yours expanding and . . . doing more of what it really wanted to do." *Id.* at 913:2-22. Smallwood testified that at this meeting, Goode "talked about the possibility

---

[1]   For ease of reference, both Smallwood and his organization will be referred to as "Smallwood."
[2]   Despite Smallwood's characterization of these materials as "confidential," he attached them in unredacted form to his Amended Complaint. *See* Am. Compl. Ex. 1, ECF Nos. 54-2 to-5.

of—he almost assured [Smallwood] that he could get a million dollars in funding from Lenfest"[3] for Smallwood's program. *Id.* at 918:3-11; *see also id.* at 925:1-8. Smallwood met with Goode a few additional times in June and July 2010, and according to Smallwood, he "kept meeting with him because [Goode] kept assuring [him] that these things could happen, that funding could possibly happen and that he had the connections to make it happen." *Id.* at 913:23-914:7, 923:2-7. In Smallwood's view, that funding was "going to happen," and he "felt that way about it." *Id.* at 923:9-13.

Goode later introduced Smallwood to a contact at the Philadelphia Leadership Foundation, Dr. Joseph Meade, and after that, Goode and Smallwood's string of meetings came to an end. *See id.* at 930:10-932:14. According to Goode, he was "trying to see whether or not there might be some idea out there, someone out there who might be able to assist [Smallwood]," because after their series of meetings, Goode had come to the conclusion that "there was nothing else [he] could do . . . at that time" to help. Goode Dep. 91:18-11, ECF No. 195-16. Accordingly, he introduced Smallwood to Meade to "see whether or not there was some way that [the Foundation] could be of help" to him. *Id.* at 87:17-88:8.

Smallwood claims that Goode "never had any desire or intention to partner, work, or provide funds to Mr. Smallwood," and he and the other Defendants "were only interested in taking Mr. Smallwood's creation, . . . The Choice is Yours, and exploiting it for their own personal, political, and financial gains." Am. Compl. ¶¶ 232-33. The essence of his claims is that Goode took the booklet of confidential materials about his organization and gave them to District Attorney Williams, who then decided to name his new diversionary program after Smallwood's organization and, with the help of P/PV, developed the program around it:

> The fact of the matter is that James Smallwood and The Choice is Yours, Inc. had meetings with high-level officers at P/PV, namely Mayor Goode, and was a nationally recognized organization that had received numerous awards from the City of Philadelphia for its civic work in the community. Shortly after those meetings, Defendant Goode and P/PV then met with DA Williams. . . . Shortly after that meeting DA Williams decided to name his program The Choice is Yours, the same exact name as [Smallwood's organization].

Pls.' Opp'n 13, ECF No. 202.

Based on these allegations, Smallwood filed suit against thirteen separate Defendants, including Williams, Goode, and P/PV, as well as the City Solicitor of the City of Philadelphia, a member of the Pennsylvania House of Representatives, four different non-profit organizations, and Smallwood's former lawyer, who represented him from 2012 to 2013. His claims ranged from violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68, to trademark infringement and dilution under the Lanham Act, 15 U.S.C. §§ 1114, 1125, and also included various state law causes of action, such as breach of contract, fraud, and

---

[3] "Lenfest" refers to the Lenfest Foundation, a philanthropic organization that operates in the Philadelphia area.

civil conspiracy. In light of the breadth of Smallwood's allegations and the number of Defendants he named—many of whom contended that they had no connection to this case—the Court directed the parties to engage in an initial phase of limited, targeted discovery with the goal of affording the parties the ability to assess whether some of the Defendants could be dismissed at an early stage of the case. *See* Order, Sept. 5, 2014, ECF No. 88.[4] That plan proved to be fruitful. After reviewing the discovery he obtained, Smallwood voluntarily dismissed seven of the Defendants. *See* Order, June 17, 2015, ECF No. 162. The Court's subsequent resolution of a number of motions to dismiss eliminated two more. *See Choice Is Yours, Inc. v. Choice Is Yours*, No. 2:14-cv-01804, 2015 WL 5584302 (Sept. 22, 2015). The remaining Defendants are Williams, Goode, P/PV, and the City of Philadelphia. Smallwood claims they are liable for RICO violations, trademark infringement, trademark dilution, and unfair competition under the Lanham Act, and breach of contract and unjust enrichment under Pennsylvania law. He further claims that Goode and P/PV are liable under state law for fraud, civil conspiracy, misappropriation of ideas, and misappropriation of name and likeness.

      The four Defendants contend that evidence that was uncovered during the targeted discovery period revealed that none of Smallwood's claims can succeed, and they have all moved for summary judgment on that record. During a status conference with the Court, Smallwood argued that these motions are premature because the targeted discovery period was not intended to be a substitute for a full period of discovery, and he has not had the chance to fully probe the merits of his claims. The Court pointed out, however, that Smallwood is protected by Federal Rule of Civil Procedure 56(d), which provides that if party is able to show that, "for specified reasons, it cannot present facts essential to justify its opposition" to a summary judgment motion, the court may deny the motion and allow the opposing the party the chance to take discovery. If Smallwood were able to show that the limitations of the targeted discovery phase had prevented him from being to respond to these motions, he would be afforded an opportunity to do so before judgment would be granted against him. The Court cautioned, however, that a party seeking to stave off a motion for summary judgment under Rule 56(d) must specify "what particular information . . . is sought; how, if disclosed, it would preclude summary judgment, and why it has not been previously obtained." *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015) (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 140 (1988)). It is not enough for a plaintiff to simply say that he or she believes that the opposing party is in possession of records that will substantiate his or her claims, or that there are witnesses who will corroborate those claims. *See Brown v. U.S. Steel Corp.*, 462 F. App'x 152, 156 (3d Cir. 2011); *Hancock Indus. v.*

---

[4] Under the Order, Smallwood was permitted to inquire into "(a) Each Defendant's alleged receipt of [the booklet of materials about Smallwood's organization that Smallwood gave to Goode]; (b) Each Defendant's alleged disclosure to any other Defendant of [that booklet of materials]; (c) Each Defendant's alleged use of [those materials]; (d) Each Defendant's alleged communication with any other Defendant regarding [Smallwood's organization] or the [booklet of materials]; (e) Each non-District Attorney Defendant's alleged use of any trademark relating to [Smallwood's organization]; (f) Each Defendant's alleged involvement in [the District Attorney's diversionary program]; (g) Alleged contracts between [Smallwood or his organization] and each Defendant; (h) The date on which [Smallwood] learned of the District Attorney's Program; and (i) [Smallwood's] alleged efforts to obtain funding [for his organization]." *Id.* at 1-2.

4

*Schaeffer*, 811 F.2d 225, 230 (3d Cir. 1987) ("To state that 'information is known to us, that simply must be pursued via discovery and deposition before the plaintiffs are in a position to respond' . . . is insufficient.").

To help guide this process, the Court issued an order directing that if, in the course of responding to Defendants' summary judgment motions, Smallwood came to the belief that further discovery was necessary for him to be able to respond to some of their contentions, he must serve a "list of the discovery that [he] believe[s] is necessary for [him] to conduct." *See* Order ¶ 5, Feb. 23, 2016, ECF No. 194. In that list, he was required to "identify each specific fact that [he was] unable to support without the opportunity for further discovery," "identify the legal contention raised in the [Defendant's motion] to which the fact pertains," explain "why that fact is material" to the outcome of the motion, and "explain why conducting that discovery was not possible during the period of targeted discovery" that Smallwood had already been afforded. *Id.*

In his response to Defendants' motions, Smallwood did none of these things. Instead, he simply stated that "discovery into many of the material questions in this case remain outstanding" and "[m]any critical individuals have not been deposed." Pls.' Opp'n 27-28. That was followed by a four-page list of discovery Smallwood would like to conduct, including thirty-one broad categories of discovery (such as "All contracts," "Phone records," and "Bank statements"), the names of fourteen people or organizations he would like to depose, and seven different topical areas he would like to examine. *See id.* at 29-32. He did not explain "what particular information is sought" or "how, if disclosed, it would preclude summary judgment." *See Shelton*, 775 F.3d at 568. Nor did Smallwood explain why he was unable to obtain this information during the targeted discovery period, particularly because a number of the topics he would like to examine overlap with the topics he was permitted to examine through that initial phase of discovery.[5] Nonetheless, it is clear from Defendants' motions that, in large part, further discovery would not shed any additional light on the arguments they have raised.

## III. Legal standard – Summary judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

---

[5] For example, Smallwood states that he would like to obtain discovery of "[a]ny and all communications relating to James Smallwood or James Smallwood's program, 'The Choice is Yours'" as well as "[e]ach Defendant's alleged involvement in the District Attorney's Program," *see* Pl.'s Opp'n 29, but two of the topics Smallwood was permitted to examine during the targeted discovery period were "[e]ach Defendant's alleged communication with any other Defendant regarding The Choice is Yours, Inc. ('James Smallwood's Program')" and "[e]ach Defendant's alleged involvement in the Choice is Yours ('District Attorney's Program')," *see* Order ¶ 1(d), (f), Sept. 5, 2014.

The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## IV. Goode and P/PV are entitled to summary judgment on Smallwood's fraud claim.

Under Pennsylvania law, to prevail on a claim that another made a fraudulent misrepresentation, the plaintiff must show the following:

> (1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

*Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). Unlike most civil claims, proof by a preponderance of the evidence is not enough to prevail. Rather, "a party alleging fraud has the burden of proving the same by clear and convincing evidence," *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991) (citing *Estate of Bosico*, 412 A.2d 505, 506 (Pa. 1980)), and that is the standard by which Defendants' summary judgment motions must be measured. *See Anderson*, 477 U.S. at 255.

Smallwood claims that he has identified "two clear fraudulent misstatements." Pls.' Opp'n 23. The first, according to Smallwood, is that "Goode stated that P/PV was considering partnering with Plaintiffs and later stated that P/PV would be partnering with Plaintiffs and that funding of $1,000,000 would be provided from Lenfest," and Smallwood claims that he was relying upon these representations when he decided to furnish Goode with the booklet of materials about his organization. *Id.* at 24. The problem with this claim is that, according to Smallwood's own testimony, he provided Goode with his booklet of materials at their first meeting, in October 2009, *see* Smallwood Dep. 414:5-416:14, but it was not until their third meeting, in December 2009, that Goode raised the possibility of partnering with P/PV, *id.* at 911:10-912:24, and it was not until their fourth meeting, in June 2010, that Goode led him to believe that he could secure funding from Lenfest, *id.* at 917:18-919:19. Even assuming that Goode made these representations, and even assuming that they were false, they happened after the act that Smallwood said he took in reliance upon them. No claim of fraud could be found on that evidence.[6]

According to Smallwood, the second misstatement occurred during an exchange he had over the phone with an employee of the Philadelphia District Attorney's Office in 2011 or 2012. He testified that after he learned that Williams and his Office may have been planning to launch a program called "The Choice Is Yours," he "started calling the District Attorney's Office, trying to

---

[6] Even if Smallwood's request for further discovery had complied with Rule 56(d), no further discovery would change the result given that it turns on Smallwood's own testimony.

find out more about their training program." *Id.* at 848:19-849:5. According to Smallwood, he was able to speak with a member of the Office who was "orchestrating" and "running" the program, but "[s]he denied that there was a The Choice is Yours program." *Id.* at 852:12-853:3. Smallwood claims that, in reliance on this statement, he "stopped momentarily" his investigation into whether the District Attorney's Office was planning to use the name of his organization for its new program, and that delay hindered his ability to challenge the Office's "theft of his intellectual property." *Id.* at 853:5-14; Pls.' Opp'n 24. Setting aside whether Smallwood could show that the person he was speaking with intended to mislead him, or whether the "momentary" delay that this statement caused to Smallwood's investigation is an actionable injury, neither the individual he spoke with over the phone, nor Williams, nor the City of Philadelphia is a defendant to his fraud claim. While Smallwood originally named both Williams and the City of Philadelphia as Defendants to this claim, the claim against Williams was dismissed under the doctrine of high public official immunity, while the claim against the City was dismissed under the immunity afforded to it by Pennsylvania's Political Subdivision Tort Claims Act, leaving only Goode and P/PV as defendants. *See Choice Is Yours, Inc.*, 2015 WL 5584302, at *5-8. Summary judgment is warranted in their favor on this claim.

## V.     Defendants are entitled to summary judgment on Smallwood's RICO claims.

Smallwood claims that all of the Defendants joined together as a RICO enterprise to "engage[] in a fraudulent scheme to steal [Smallwood's] nonprofit." Pls.' Opp'n 21. He invokes 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." For Smallwood to prevail, he must establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). He also invokes § 1962(d), which forbids any person from conspiring to violate RICO.

There are a number of difficulties with these claims. The first is that Smallwood is unable to point to any facts suggesting that Goode, Williams, P/PV, and the City of Philadelphia had formed an enterprise. "[T]he 'enterprise' element of a § 1962(c) claim can be satisfied by showing a 'structure,' that is, a common 'purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 368 (3d Cir. 2010) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). Despite having the ability during the targeted discovery period to inquire into "[e]ach Defendant's alleged communication with any other Defendant regarding . . . Smallwood's Program . . . or the [booklet of] materials" that Smallwood gave to Goode, as well as "[e]ach Defendant's alleged disclosure to any other Defendant" of those materials,[7] Smallwood was unable to uncover any evidence that any of these Defendants had so much as discussed Smallwood or his organization. Nor has he produced any evidence that

---

[7]     *See* Order ¶1(b), (d), Sept. 5, 2014.

Goode disclosed the booklet of materials that Smallwood gave to him to any of the other Defendants, or to any other person.

While "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise," *id.* (quoting *Boyle*, 556 U.S. at 951), Smallwood cannot substantiate his claims that these Defendants engaged in any racketeering activity—let alone a pattern of such activity. The racketeering activity that Smallwood contends the Defendants committed—the "predicate acts," in RICO parlance—consists of mail fraud and wire fraud. *See* 18 U.S.C. § 1961(1)(B). Both require a showing that a defendant used mail or wire communications in furtherance of a scheme to defraud. *See United States v. Syme*, 276 F.3d 131, 142 n.3 (3d Cir. 2002) (citing 18 U.S.C. §§ 1341, 1343). While Smallwood contends that his "entire Amended Complaint is devoted to demonstrating how the defendants intentionally participated in a scheme to defraud Plaintiffs of money and their intellectual property," *see* Pls.' Opp'n 20, the only fraudulent scheme that Smallwood has identified is his contention that Goode obtained the booklet of materials about Smallwood's organization under false pretenses. As the Court has already observed, that contention is not supported by Smallwood's own testimony. To be sure, Smallwood claims that Defendants engaged in other wrongful conduct, such as misappropriating his ideas and infringing upon his trademark for "The Choice is Yours," but those acts do not sound in fraud, or otherwise qualify as predicate acts of racketeering. *See* § 1961(1); *Terrell v. Eisner*, 104 F. App'x 210, 212 (2d Cir. 2004) (recognizing that "common-law misappropriation . . . is not a predicate act under RICO"); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 n.2 (S.D.N.Y. 1996) (recognizing that the Lanham Act is "not among those [statutes] listed under § 1961(1) and, therefore, alleged violations of [that Act] cannot satisfy the requirement for . . . RICO predicate acts"), *aff'd*, 113 F.3d 1229 (2d Cir. 1997). Thus, even if Goode did discuss Smallwood's organization with Williams at some time and provide him with a copy of Smallwood's booklet of materials—despite there being no evidence of that occurring—and even if Williams then decided to name his new diversionary program after Smallwood's organization and incorporate elements of it into his program, none of that conduct would constitute racketeering.[8]

---

[8] Even if Goode did acquire the booklet of materials from Smallwood as part of a fraudulent scheme, the specific wire communications that Smallwood has identified would not constitute either mail or wire fraud because they would not have been made in furtherance of that scheme. Smallwood points to a collection of blog posts, Twitter messages, and news reports through which Williams promoted the launch of his Office's diversionary program and argues that these communications were made "in furtherance of [the Defendants'] fraudulent activity." *See* Pls.' Opp'n 20-21. But if it were true that Defendants had obtained Smallwood's booklet of materials under false pretenses, Williams's decision to publicize the fact that he had adapted his program from Smallwood's organization and taken its name would not be furthering Defendants' scheme to defraud Smallwood; that would be reaping the benefits of it. *See Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 404 (E.D. Pa. 2009) ("The alleged subsequent business use of the misappropriated information . . . is not a predicate act of the scheme; indeed, it was possible only because the fraud had reached fruition and achieved the misappropriation at issue."). Smallwood also relies on these promotional communications to show that Defendants' racketeering activities satisfy RICO's continuity requirement, *see* Pls.' Opp'n 21 ("The DA Defendants continue to claim credit for Plaintiffs' program, misrepresenting to the public that it is theirs by way of the wires . . . ."), but because these communications would not be in furtherance of any fraudulent scheme, they would not be predicate acts and would not count toward a showing of continuity.

The more fundamental problem with Smallwood's RICO claims is that the damages he claims that he has suffered are not actionable under the statute. According to Smallwood, he has suffered "severe damages" that "include[] the dilution of his mark, the loss of funding that was supposed to come from the Lenfest Foundation, the difficulty in obtaining new donations given that another program has an identical name, and the harm to the reputation of his program." Pls.' Opp'n at 25. Under RICO, a private right of action is available only for a person who was "injured in his business or property" by a violation of the statute. 18 U.S.C. § 1964(c). This requirement calls for "proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (quoting *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994)). That means that injuries such as "harm to goodwill and reputation," *see The Knit With v. Knitting Fever, Inc.*, 625 F. App'x 27, 35 (3d Cir. 2015) (McKee, C.J.), *cert. denied*, 136 S. Ct. 1662 (2016), or loss of value to intellectual property such as trade secrets, even if that loss could be measured, *see Litton Sys., Inc. v. Ssangyong Cement Indus. Co.*, 1997 WL 59360, at *10 (Fed. Cir. 1997) (unpublished table opinion), are not sufficient. Instead, there must be "proof of actual monetary loss, i.e., an out-of-pocket loss." *Maio*, 221 F.3d 483 (citing *Steele*, 36 F.3d at 70)). With the exception of Smallwood's contention that he was deprived of funding from the Lenfest Foundation, his injuries all relate either to harm caused to his intangible property—"The Choice is Yours" name—or to the reputation of his business. That may be valuable intangible property, but harm to it is not actionable under RICO.

While lost funding could constitute an out-of-pocket loss, no reasonable jury could find that Smallwood's organization was deprived of funding from the Lenfest Foundation—if indeed it was—as a proximate cause of any of the conduct that Defendants allegedly engaged in. According to Smallwood, by naming his program "The Choice is Yours" (which Smallwood refers to as "[The Fake] The Choice is Yours") and incorporating ideas from Smallwood's organization into his program, Williams was able to secure a $1 million grant from the Lenfest Foundation that should have gone to Smallwood's organization (which he refers to as "[The Real] The Choice is Yours"):

> In addition to the substantial confusion [The Fake] The Choice is Yours causes in the marketplace with respect to [The Real] The Choice is Yours, Defendants and [The Fake] The Choice is Yours have caused Plaintiffs millions of dollars in money damages because funds and donations supposed to go to [The Real] The Choice is Yours were given to [The Fake] The Choice is Yours.

Am. Compl. ¶ 286. As Smallwood testified, he contends that his program "was handed to the District Attorney and he used that to get funding for his The Choice is Yours." *See* Smallwood Dep. 996:15-997:9. While a loss of a specific funding grant could be a concrete financial loss, an injury is actionable only if it "was proximately caused by the defendant's violation of 18 U.S.C. § 1962." *Maio*, 221 F.3d at 483 (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994)). There are two reasons why no jury could find that Lenfest's decision to provide funding to Williams's diversionary program was linked to any fraudulent scheme to

obtain confidential information about Smallwood's organization. First, as already observed, Smallwood was unable to produce any evidence to show that Goode "handed" Williams the booklet of materials that Smallwood gave to him, or that Goode and Williams even discussed Smallwood's organization. Second, Defendants have produced evidence that the Lenfest Foundation took an interest in Williams's diversionary program *before* he decided to name it "The Choice is Yours." At the time that discussions began between the District Attorney's Office and Lenfest, the Office was referring to the proposed diversionary program as the "Back on Track" program—the name of a prominent diversionary program operated by the San Francisco District Attorney's Office. *See* Mot. of Phila. & Williams Ex. 2, ECF No. 191-12 (containing a copy of an email from a representative of Lenfest to a member of the District Attorney's Office, in which he referred to Williams's "vision to create a first class 'Back on Track' program"). Indeed, a comprehensive proposal submitted to Lenfest early in 2010 referred to the proposed diversionary program as the "Philadelphia Back on Track Project" and explained that the program was intended to "build[] off of the San Francisco Back on Track Program." *Id.* Ex. 5, at DA000971, DA000975, ECF No. 191-15.[9] Because Lenfest's interest in Williams's diversionary program predated Williams's decision to name it "The Choice is Yours"—and predated even the design of the program—even if Goode did provide Williams with a copy of the booklet of materials about Smallwood's organization and even if that led Williams to name his program after Smallwood's organization, no reasonable jury could conclude that either of those acts were the proximate cause of Lenfest's decision to become involved with Williams's diversionary program. Smallwood therefore cannot show that he "suffered an injury to business or property" and that his injury "was proximately caused by [Defendants'] violation of [RICO]," *see Maio*, 221 F.3d at 483 (citing *First Nationwide*, 27 F.3d at 767), which means that Defendants are entitled to summary judgment on his RICO claims.[10]

## VI.    Goode and P/PV are entitled to summary judgment on Smallwood's claim for misappropriation of name or likeness.

In Smallwood's Amended Complaint, he included a claim on behalf of him and his organization that Defendants misappropriated their names and likenesses by calling the diversionary program "The Choice is Yours."[11] As the Court previously held, Smallwood has no claim that his name or likeness has been misappropriated. "[W]hile the name of [his]

---

[9]    In his response to a statement of undisputed material facts filed by Williams and the City of Philadelphia, Smallwood states that he disputes these facts because "the exact nature of Lenfest's involvement" has not been revealed through discovery and because Williams has not yet been deposed. *See* Pls.' Resp. to Facts of Phila. & Williams ¶¶ 3, 8, ECF No. 202-3. But Smallwood concedes that Williams did not decide to name the diversionary program "The Choice Is Yours" until at least November 2010—at least six months after Lenfest became involved with the program—and he offers no explanation for how further discovery would alter that fact. *See* ¶ 5.

[10]   Smallwood's inability to prove an actionable injury under RICO is fatal to both his § 1962(c) claim and his § 1962(d) claim. *See Magnum v. Archdiocese of Philadelphia*, 253 F. App'x 224, 229 (3d Cir. 2007) (citing *Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285, 290 (3d Cir. 1996)) ("[A] plaintiff's inability to allege injury to business or property for purposes of § 1962(c) necessarily forecloses any claim brought under § 1962(d).").

[11]   This claim was dismissed as to Williams under the doctrine of high public official immunity and as to the City of Philadelphia under the immunity afforded to it by Pennsylvania's Political Subdivision Tort Claims Act. *See Choice Is Yours*, 2015 WL 5584302, at *5-8.

organization may be identified with him or evoke him in the minds of others, it is not an attribute of [him] that identifies him." *See Choice Is Yours*, 2015 WL 5584302, at *4. In other words, "[a] person who hears the name 'The Choice is Yours' may think, 'That's James Smallwood's organization,'" but "[t]hat person would not think, 'That's James Smallwood.'" *Id.*

Nor does Smallwood's organization, The Choice is Yours, Inc., have a claim. The purpose of this claim is to protect "the interest of [an] individual in the exclusive use of his own identity" based on the recognition when someone else "makes use of [one's] name or likeness for his own purposes and benefit," that invades the person's privacy. *See* Restatement (Second) of Torts § 652C & cmts. a, b (Am. Law. Inst. 1977) ("One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."). Because "[a] corporation, partnership or unincorporated association has no personal right of privacy," an organization like The Choice is Yours, Inc. has no claim that its name or likeness has been misappropriated. *Id.* § 652I cmt. c. An organization may have the right to prevent others from using its name, but that right finds its protection under the law of trademarks and unfair competition, not through a privacy tort. *See id.*[12]

### VII.  Goode and P/PV are entitled to summary judgment on Smallwood's claim for misappropriation of ideas.

Smallwood also claims that ideas belonging to either Smallwood or his organization were incorporated into Williams's diversionary program, and Defendants are therefore liable for misappropriating those ideas.[13] Under Pennsylvania law, a claim for misappropriation of an idea requires a showing that "(1) the plaintiff had an idea that was novel and concrete, and (2) his idea was misappropriated by the defendant." *Blackmon v. Iverson*, 324 F. Supp. 2d 602, 607 (E.D. Pa. 2003) (citing *Sorbee Int'l Ltd. v. Chubb Custom Ins. Co.*, 1999 PA Super 178 (1999)). For an idea to be "novel and concrete," the idea generally must be "capable of being identified as having been created by one party and stolen or appropriated by another." *Sorbee*, 1999 PA Super 178, at ¶ 8 (citing *Thomas v. R.J. Reynolds Tobacco Co.*, 38 A.2d 61, 63-64 (Pa. 1944)). That means that the idea must be "truly innovative, inventive, and new," not simply a "variation of already existing ideas." *Blackmon*, 324 F. Supp. 2d at 607-08.

Smallwood contends that the training program he runs through his organization is a novel and concrete idea. He describes his program as "an innovative nonprofit . . . [that] rehabilitates ex-offenders, drug addicts, and the homeless by teaching them the construction and maintenance trades as well as basic life skills" and arranges for interviews "with interested companies for job placement so that these individuals can become gainfully employed and rejoin society as productive members of their communities." Am. Compl. ¶ 2. During his deposition, however, Smallwood acknowledged that his program was "built around recidivism, reentry and those

---

[12]  The same is true under Pennsylvania's "Unauthorized use of name or likeness" statute, which provides that "[a]ny *natural person* whose name or likeness has commercial value and is used for any commercial or advertising purpose . . . may bring an action to enjoin such unauthorized use." *See* 42 Pa. Cons. Stat. Ann. § 8316 (West 2007) (emphasis added).

[13]  As with Smallwood's claim for misappropriation of name or likeness, both Williams and the City of Philadelphia were dismissed as defendants to this claim pursuant to their respective immunities. *See supra* note 11.

kinds of things" and that he was not the first to conceive of the idea of this type of program. *See* Smallwood Dep. 539:11-15, 540:2-11. Nonetheless, he emphasized that his program is distinctive because "[i]t works," and because he employs people "who actually care about the people who [they] are training." *Id.* at 540:15-543:6. He also points to the fact that he and his program have received a number of awards for the work they have done.

Simply put, this is not a novel idea.[14] As Smallwood acknowledged, providing vocational training and mentoring to criminal offenders or those who are out of work is neither inventive nor new. *See generally* Amy L. Solomon et al., Urban Institute, *Outside the Walls: A National Snapshot of Community-Based Prisoner Reentry Programs* (2004) (surveying nearly 100 reentry programs nationwide); Maria L. Sachs, *The Prospects for Ending Welfare as We Know It*, 5 Stan. L. & Pol'y Rev. 99 (1994) (tracing a number of prominent federal efforts to provide training and support to the unemployed over the last fifty years). While Smallwood maintains that his program is unique because of its longevity, *see* Smallwood Dep. 546:8-12 ("I strongly believe . . . that if a program lasts five, ten, 15, 17 years, . . . that's the uniqueness about a program."), the fact that Smallwood's implementation of these ideas may have been successful does not make the ideas themselves novel. Accordingly, Defendants are entitled to summary judgment on this claim.[15]

## VIII. Defendants are entitled to summary judgment on Smallwood's breach of contract claim but not on his claim for unjust enrichment.

Smallwood claims that as a result of his meetings with Goode, a contract was formed pursuant to which "P/PV and [Smallwood and his organization] were going to partner and that $1,000,000 would be coming from the Lenfest Foundation." Pls.' Opp'n 22-23. In support, Smallwood relies solely on a statement he made during his deposition, where he testified, "I believe there was money that I could have received had I went along with the program . . . the million dollars which was promised to me by Wilson Goode, if I went along with that, that would have come to me." Smallwood Dep. 457:17-458:10. However, Smallwood's own descriptions of these meetings belie any notion that the parties formed an agreement—express or implied—for Goode to secure funding for Smallwood's organization.

Smallwood testified that at their first meeting, in October 2009, they "met to talk about funding for the The Choice is Yours," the possibility of "a partnership with The Choice is Yours and one of [Goode's] organizations," and about how Smallwood's organization could "improve Philadelphia." *Id.* at 902:8-903:7. Then, in December 2009, they met again and "discussed The Choice is Yours and . . . P/PV . . . and possibly partnering and working with them." *Id.* at 421:14-19. Smallwood explains that the meeting consisted of "similar discussions [they] always have had of how to improve The Choice is Yours, how to use it to make Philadelphia a better

---

[14] Whether an idea is novel appears to be a question of law, *see Baer v. Chase*, 392 F.3d 609, 628 (3d Cir. 2004); *Duffy v. Charles Schwab & Co.*, 123 F. Supp. 2d 802, 809 (D.N.J. 2000) (collecting cases from various jurisdictions), but even if this were a question of fact, no reasonable jury could conclude otherwise.

[15] With this conclusion, none of Smallwood's tort claims remain. That means that his claim for civil conspiracy under Pennsylvania law must fail as well. *See Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000).

place to live and how to improve the—the citizens here who were not working, who were homeless, who were coming home from the war—and to stop recidivism." *Id.* at 911:1-9. According to Smallwood, during that meeting Goode "mentioned other organizations and other people who he ha[d] close ties with who he could possibly introduce [Smallwood] to that could be of help to The Choice is Yours," and "[a]mong those was the P/PV." *Id.* at 912:6-12. When they met again in May 2010, "that meeting went on to talk about—more about P/PV, more about funding, more about getting money. And it just continued on to elevate and [Smallwood's] enthusiasm started to grow in reference to The Choice is Yours expanding and . . . doing more of what it really wanted to do." *Id.* at 913:11-17. According to Smallwood, at that meeting, Goode "talked about the possibility of—he almost assured [him] that he could get a million dollars in funding from Lenfest" and that "funding was no problem, you know, he could get it from Lenfest—through P/PV." *Id.* at 918:7-11

Goode disagrees with Smallwood's recollection of these meetings, but even based on Smallwood's account, no reasonable jury could conclude from this testimony that Goode had entered into an agreement with Smallwood to provide him with a $1 million in funding and forge a binding relationship with P/PV. His testimony reveals that, at most, the two were discussing the "possibility [of] partnering" and the "possibility" of finding a source of funding for Smallwood's organization. Even Smallwood's testimony that "[one] million dollars [was] promised to [him] by Wilson Goode" was prefaced by the statement that Smallwood "believe[d] there was money that [he] could have received had [he] went along with program." These conversations amount to nothing more than a mutual exploration into whether Goode and Smallwood may have been able to work together, and "[i]t is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298 (3d Cir. 1986) (citing *Goldman v. McShain*, 247 A.2d 455, 458 (Pa. 1968); *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956); *Kazanjian v. New England Petroleum Corp.*, 480 A.2d 1153, 1157 (Pa. Super. Ct. 1984)). As Smallwood himself explains, he attended these meetings with Goode because Goode "kept assuring [him] that these things could happen, that funding could possibly happen and that he had the connections to make it happen." Smallwood Dep. 923:2-7. That Goode may have given Smallwood an idea of how expansive his capabilities are—including the fact that Goode "assured [him] that he could get a million dollars in funding from Lenfest"—does not mean that the two entered into a funding agreement for Smallwood's organization.

Smallwood suggests that an implied contract could be found under these circumstances, but one could not. Implied contracts are formed "where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances." *Cameron v. Eynon*, 3 A.2d 423, 424 (Pa. 1939). These contracts "arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." *Hertzog v. Hertzog*, 29 Pa. 465, 468 (Pa. 1857). No mutual intention to contract could be inferred from

13

these meetings between Smallwood and Goode. Rather, as Smallwood explains, they met because he and Goode had similar interests—Smallwood in "help[ing] those who were coming out of jail," and Goode in "helping the children of those who were incarcerated"—and Goode was someone with "quite a few municipal contacts" who "could potentially help grow The Choice is Yours." *See* Smallwood Dep. 902:4-904:11. Had any contract emerged from those meetings, it would have had to have been an express one, because the mere fact that Smallwood and Goode held a series of meetings to discuss Smallwood's organization and Goode's resources permits no inference that a contract was formed between them.

Smallwood also contends that he has a claim for unjust enrichment based on these facts, but he does not explain why that is so. Instead, he simply recites the familiar principles that underlie the entire body of the law of restitution and unjust enrichment: the defendant was enriched, "the enrichment was at the expense of plaintiff," and "equity and good conscience require restitution should be made." *See* Pls.' Opp'n 22-23; *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 (Am. Law. Inst. 2011) ("A person who is unjustly enriched at the expense of another is subject to liability in restitution."). But as with any other area of common law, the law of restitution and unjust enrichment is made up of various theories of liability that apply to different factual scenarios; it is not an opportunity to engage in an unbounded inquiry into the relative equities of a case. *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmts. a & b (Am. Law. Inst. 2011); *Meehan v. Cheltenham Twp.*, 189 A.2d 593, 596 (Pa. 1963) (recognizing that "[t]he Restatement of Restitution sets forth various rules for the determination of whether the retention of a particular enrichment is unjust"). For a plaintiff, this means that it is essential to explain why "a particular transaction is productive of unjust enrichment," not simply suggest that there has been "unjust enrichment in any such broad sense." *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. b.

Smallwood has done only the latter. His argument in support of his claim of unjust enrichment consists merely of the contention "that even if an implied contract is not found to exist for one or more of defendants[,] the elements of unjust enrichment are met by the above facts"—with "above facts" appearing to refer to his contention that "Defendants . . . exploit[ed] his program and us[ed] it[s] name." *See* Pls.' Opp'n 23. While it cannot be said for sure, Smallwood appears to be invoking the principle that "[a] person who obtains a benefit by misappropriation or infringement of another's legally protected rights in any idea, expression, information, image, or designation is liable in restitution to the holder of such rights." *See* Restatement (Third) of Restitution and Unjust Enrichment § 42. This principle recognizes that a person whose intellectual property has been misappropriated or infringed can recover the benefits that the other has wrongfully obtained. In other words, this claim is, in effect, an alternative remedy to damages that a plaintiff can elect if recovering the benefits the wrongdoer obtained is more favorable than recovering damages. *See* Restatement (Third) of Restitution and Unjust Enrichment ch. 5, topic 1, intro. note.[16] Whether Smallwood can exercise this claim thus

---

[16] For practical purposes, this claim may largely—if not entirely—overlap with the remedies that would be available to Smallwood for trademark infringement under the Lanham Act because the act expressly permits a

depends upon the success of his underlying claims for misappropriation and trademark infringement. *See* Restatement (Third) of Restitution and Unjust Enrichment § 42 cmt. b. ("The law of restitution does not define the substantive rules of ownership on which a claim for infringement or misappropriation rests."). As the Court has already concluded, judgment is warranted in Defendants' favor on Smallwood's misappropriation claims, which means his unjust enrichment claim rises or falls on the merits of his claims for trademark infringement. *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, No. 12 Civ. 7992, 2014 WL 185222, at *13 (S.D.N.Y. Jan. 16, 2014) ("Here, plaintiff's unjust enrichment claim is founded on defendants' alleged infringement of its marks. Because those claims survive summary judgment, plaintiffs' unjust enrichment claim must also survive summary judgment."). Those claims are the subject of the next and final section of this Opinion.

### IX. Goode is entitled to summary judgment on Smallwood's trademark infringement claims, but the other Defendants are not.

Finally, Smallwood claims that Defendants are liable under the Lanham Act for infringing and diluting the trademark of his organization, "The Choice is Yours." *See* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A), (c).[17] Defendants each raise the same two arguments against these claims. First, they contend that the Lanham Act does not apply because Williams's diversionary program, which was available only to offenders charged in Philadelphia, did not affect interstate commerce. Second, they contend that there was no possibility of confusion between Williams's diversionary program and Smallwood's organization because no person seeking to enroll in Smallwood's program could confuse it with Williams's diversionary program, which was available only to criminal defendants seeking to avoid jail time.[18] Neither argument has merit.

---

prevailing party to recover the infringer's profits. *See* 15 U.S.C. § 1117(a) (providing that a prevailing party may, "subject to the principles of equity, . . . recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action"); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 42 cmt. f, illus. 9 (observing that a plaintiff who proves that a defendant willfully infringed the plaintiff's trademark could recover the defendant's profits "both by statute (15 U.S.C. § 1117) and by ordinary principles of restitution (§ 51(4))"). Even if that is so, the law of restitution can nonetheless offer guidance on when that remedy is available and how to calculate the amount, given that an award of an infringer's profits is a restitutionary concept. *See* Restatement (Third) of Restitution and Unjust Enrichment § 42 cmt. a.

[17] Though Smallwood does not say, he likely invoked both § 1114(a), which protects registered marks, and § 1125(a)(1)(A), which protects unregistered marks, because he did not obtain a federal registration for the name of his organization until May 7, 2013—after Williams launched his diversionary program. *See* Am. Compl. Ex. 8, ECF No. 54-12.

[18] In his response to Defendants' motions, Smallwood makes no effort to defend his claim for trademark dilution under 15 U.S.C. § 1125(c). That is likely because § 1125(c) protects only "famous" marks, which are defined as marks that are "widely recognized by the general consuming public of the United States." Smallwood has presented no evidence that the name of his organization is a "highly distinctive mark[] that [is] well-known throughout the country," *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007) (quoting *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001)), and it is clear from the evidence that has been presented that he could not. Defendants are therefore entitled to summary judgment on this claim.

### A. The use of Smallwood's mark for Williams's diversionary program satisfies the interstate commerce requirement of the Lanham Act.

Both § 1114(a) and § 1125(a)(1)(A) of the Lanham Act apply only to defendants who use a mark "in commerce" that is likely to cause confusion with the plaintiff's mark. *See* § 1114(a) (providing a cause of action against "[a]ny person who shall, without the consent of the registration—use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark"); § 1125(a)(1)(a) (proving a cause of action against "[a]ny person who . . . uses in commerce any word, term, name, symbol, or device . . . likely to cause confusion, or to cause mistake, or to deceive"). The term "commerce" refers to "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. This requirement, of course, owes to the fact that Congress's authority to regulate trademarks derives from the Commerce Clause. *See In re Trade-Mark Cases*, 100 U.S. 82 (1879); § 1127.

Defendants focus on the fact that Williams's diversionary program was a creature of the Philadelphia District Attorney's Office that operated only within Williams's jurisdiction: the City of Philadelphia. In their view, that means that no aspect of the program, including its name, is within the scope of Congress's Commerce Clause powers. But it is well settled that "Congress's authority under the interstate commerce clause extends to purely intrastate activity if that activity substantially affects interstate commerce." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 165 (3d Cir. 2001) (citing *United States v. Lopez*, 514 U.S. 549, 558-59 (1995)). "Thus, 'in commerce' refers to the impact that infringement has on interstate use of a trademark; it does not mean that an infringer is immune from prosecution under the statute so long as he keeps his infringement entirely within the confines of a state." *Coca-Cola Co. v. Stewart*, 621 F.2d 287, 290 (8th Cir. 1980). With these principles in mind, a number of courts have concluded that "[a] substantial effect on interstate commerce is present when the trademark owner's reputation and good will, built up by use of the mark in interstate commerce, are adversely affected by an intrastate infringement." *See Franchised Stores of N.Y., Inc. v. Winter*, 394 F.2d 664, 669 (2d Cir. 1968); *accord Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 559 (1st Cir. 1982) (collecting cases from five other circuit courts); *Laurel Capital Grp., Inc. v. BT Fin. Corp.*, 45 F. Supp. 2d 469, 477 (W.D. Pa. 1999) (quoting *Coca-Cola Co.*, 621 F.2d at 290) (D.B. Smith, J.).[19]

Smallwood holds a federal registration for the name "The Choice is Yours," and in order to obtain that registration, he was required to certify that the mark is in use in interstate commerce. *See* 15 U.S.C. § 1051(a)(3)(C). All four Defendants have assumed for the purposes of their motions that the name is indeed protectable under the Lanham Act,[20] and none of them

---

[19] *See* Mem. Supp. Mot. Phila. and Williams 10 n.7, ECF No. 191-3; Mot. Goode 25 n.7, ECF No. 195; Mem. Supp. Mot. P/PV 25 n.11, ECF No. 196-3.

[20] As a leading treatise on trademarks candidly observes, these "decisions interpreting the 'use in commerce' requirement for infringement of federally registered marks have virtually eliminated the 'local use' defense" because "[o]ne assumes that the plaintiff-federal registrant is using its mark in interstate commerce," and "[e]ven local acts of infringement by defendant will have a substantial effect upon the interstate usage of plaintiff's trademark." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:57, Westlaw (database updated Sept. 2016).

have argued that Smallwood has not built up a reputation and goodwill in the name that may have been harmed by Williams's use of the name for his diversionary program. Accordingly, Defendants have not demonstrated that they are entitled to summary judgment on this ground.

**B.     Defendants have not addressed the primary type of confusion that Williams's diversionary program may have caused.**

Defendants also contend that they cannot be liable for infringing Smallwood's mark because there is no possibility of confusion between the two. Of course, "[t]he touchstone of infringement is whether the use creates a likelihood of confusion," *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 210 (3d Cir. 1999) (en banc) (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir. 1998)), and Defendants argue that no confusion is possible here, because Smallwood's organization and Williams's diversionary program serve mutually exclusive populations. It is true that no one seeking to participate in Smallwood's program could end up participating in the District Attorney's diversionary program (unless they first committed a crime), and it is also true that a criminal defendant seeking to avoid jail time had but one option: the District Attorney's diversionary program. What Defendants overlook, however, is that Smallwood's primary contention is not that they may have created confusion among potential participants in his program, but that they may have created confusion among potential *donors* to his organization. In his Amended Complaint, Smallwood alleged that Defendants "made it nearly impossible for [him] to obtain donations and funding," Am. Compl. ¶ 113, a charge he reiterated during his deposition, *see* Smallwood Dep. 997:19-22 (stating that he has "f[ound] it very difficult to accrue funding for The Choice is Yours"). For non-profit organizations like Smallwood's, protecting their identity is critically important, because "[i]f the distinct identity of such non-profit organizations is lost through a confusingly similar use of a name by another, then it is obvious that the organization will have serious difficulty in raising funds and attracting . . . support." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 9.5, Westlaw (database updated Sept. 2016). For this reason, a number of courts have enjoined defendants from using the marks of nonprofits that use those marks to solicit funding. *See, e.g.*, *Cancer Research Inst., Inc. v. Cancer Research Soc'y, Inc.*, 694 F. Supp. 1051, 1056 (S.D.N.Y. 1988) (recognizing that the plaintiff's "interest in protecting its name and reputation is an important consideration"); *Am. Diabetes Ass'n, Inc. v. Nat'l Diabetes Ass'n*, 533 F. Supp. 16, 21 (E.D. Pa. 1981), *aff'd*, 681 F.2d 804 (3d Cir. 1982). Defendants do not address the possibility that Williams's program may have created confusion among the potential pool of donors to Smallwood's program, which means that they have not shown that no jury could find in Smallwood's favor on this point.

**C.     The commerciality of the District Attorney's Office's use of Smallwood's mark**

One remaining question is whether the District Attorney's Office used Smallwood's mark in a commercial manner. As one court has observed, the predominant view among the circuit courts appears to be that the Lanham Act does not protect against noncommercial uses of marks. *See Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 322 (4th Cir. 2015) (citing *Farah v.*

17

*Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013); *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1052-54 (10th Cir. 2008); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676-77 (9th Cir. 2005); *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999)). These courts base this requirement on the fact that both § 1114(a) and § 1125(a)(1) prohibit only the uses of protected marks "in connection with" goods or services. *See Radiance Found.*, 786 F.3d at 322. But, not all courts agree. *See United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 90 (2d Cir. 1997).

Even those courts that do impose a commerciality requirement generally recognize that engaging in fundraising may satisfy the requirement. *See, e.g.*, *Radiance Found.*, 786 F.3d at 327 ("A solicitation may satisfy the 'in connection with' element if the trademark holder demonstrates a sufficient nexus between the unauthorized use of the protected mark and clear transactional activity. Such a nexus may be present, for example, where the protected mark seems to denote the recipient of the donation."); *Valley Forge Military Acad. Found. v. Valley Forge Old Guard, Inc.*, 24 F. Supp. 3d 451, 456 (E.D. Pa. 2014) (finding that an alumni association's use of a mark to "provide services to the Academy's alumni and to solicit donations for alumni services" satisfied the requirement); *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, No. 97 CIV. 0629, 1997 WL 133313, at *6 (S.D.N.Y. Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998) ("Courts have found that fund-raising activities may bring a defendant's actions within the scope of the Lanham Act.").[21] Here, Williams's diversionary program was not funded from the City's coffers but from "generous donations from the Lenfest and William Penn Foundations." *See* Am. Compl. Ex. 7, at 54-7. As the Court has already observed, Lenfest became involved in the program before Williams chose to name it "The Choice Is Yours," which means that Williams's Office did not use that name to attract that funding. Whether Williams's Office may have engaged in other fundraising, or whether soliciting funding from the William Penn Foundation would be sufficient, standing alone, to bring the name of the diversionary program within the reach of the Lanham Act need not be decided now, because Defendants have not addressed this topic in their motions. Nor has Smallwood had the opportunity to obtain discovery about the funding for Williams's diversionary program because it was not within the scope of the targeted discovery period. On the record that has been presented through these motions, Smallwood's claims for trademark infringement are viable.[22]

---

[21] Even the Second Circuit's decision in *United We Stand*, which the Fourth Circuit viewed as a decision endorsing the view that no commercial nexus need be shown, emphasized the fact that the alleged infringer, United We Stand, America New York, Inc., "was incorporated 'to solicit, collect and otherwise raise money' in support of the presidential candidacy of Ross Perot." *See United We Stand*, 128 F.3d at 90.

[22] Goode, however, is entitled to summary judgment on these claims. Despite having the opportunity to conduct discovery into "[e]ach Defendant's alleged communication with any other Defendant regarding [Smallwood's organization]" and "[e]ach non-District Attorney Defendant's alleged use of any trademark relating to [Smallwood's organization]," *see* Order ¶ 1(d), (e), Sept. 5, 2014, Smallwood was unable to point to any evidence to suggest that Goode had discussed Smallwood's organization with Williams or members of his Office or that Goode had any involvement in the selection of the name "The Choice Is Yours" for the diversionary program. Accordingly, no reasonable jury could find that Goode was liable for infringing Smallwood's mark, either directly or secondarily. This also means that Goode is entitled to summary judgment on Smallwood's claim for unjust enrichment.

**X.      Conclusion**

Goode is entitled to summary judgment on all of Smallwood's claims, while Williams, the City of Philadelphia, and P/PV are entitled to summary judgment on each claim except for Smallwood's claims for trademark infringement under § 1114(a) and § 1125(a)(1)(A) of the Lanham Act and unjust enrichment. An appropriate order follows.[23]

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[23] Each Defendant is also entitled to summary judgment on Smallwood's claim of "Equitable Relief – Right of Attribution," to the extent Smallwood contends that these allegations state a separate claim. *See* Am. Compl. ¶¶ 345-53. These allegations are simply a request for certain remedial relief, which Smallwood can advance in the event that he prevails on his claims for trademark infringement. That said, Smallwood has offered no authority for the proposition that he would be entitled to an order directing Defendants "to publicly apologize for their outrageous conduct, the abuse of their public positions, and also to acknowledge James Smallwood's role as the founder and sole creator of 'The Choice is Yours' name, program, organization, and mark." *Id.* ¶ 353.